UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:                                          Chapter 11

MARKETXT HOLDINGS CORP.,                         Case No. 04-12078 (ALG)
                                                 (Substantively Consolidated)
                        Debtor.                  Adv. Pro. No. 08-1102

---

ALAN NISSELSON, as Chapter 11 Trustee
of MARKETXT HOLDINGS CORP. and the
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,
                                                 Case No. 08-CV-05963 (MGC)
                Plaintiffs-Appellees,

        -against-

KEVIN WALTZER and
STEWART F. GROSSMAN, Trustee
of the Newton Trust,

                Defendants-Appellants.

---

**BRIEF OF APPELLANTS KEVIN WALTZER AND STEWART F. GROSSMAN, TRUSTEE OF THE NEWTON TRUST, IN SUPPORT OF APPEAL FROM ORDER GRANTING SUMMARY JUDGMENT SUBORDINATING CLAIM PURSUANT TO SECTION 510(b) OF THE BANKRUPTCY CODE**

COLE, SCHOTZ, MEISEL,                    EISEMAN LEVINE LEHRHAUPT &
FORMAN & LEONARD, P.A.                   KAKOYIANNIS, P.C.
A Professional Corporation               805 Third Avenue
900 Third Avenue                         New York, NY 10022
New York, NY 10022                       Tel.: (212) 752-1000
Tel.: (212) 752-8000                     Fax: (212) 355-4608
Fax: (212) 752-8393                      Eric R. Levine, Esq. (EL-7677)
Laurence May, Esq. (LM-9714)

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF ISSUE PRESENTED ON APPEAL ............................................. 5

STANDARD OF APPELLATE REVIEW ................................................................. 5

STATEMENT OF FACTS ...................................................................................... 5

      POINT I
          THE BANKRUPTCY COURT ERRED IN HOLDING THAT
          MR. WALTZER'S CLAIM IS SUBJECT TO SUBORDINATION
          UNDER SECTION 510(b)........................................................................ 10

      POINT II
          THE SECOND CIRCUIT DECISION IN MED DIVERSIFIED
          REQUIRES THE REVERSAL OF THE BANKRUPTCY
          COURT'S SUMMARY JUDGMENT ................................................... 15

CONCLUSION ................................................................................................... 20

51041/0001-3110913v1

# TABLE OF AUTHORITIES

## CASES                                                                PAGES

Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133
(3d Cir. 2002) .......................................................................................... 4, 18, 19,
........................................................................................................... 20

FDIC v. Giammettei, 34 F.3d 51 (2d Cir. 1994) .......................................... 5

Hanover Direct, Inc. v. T.R. Acquisition Corp. (In re T.R. Acquisition Corp.), No. 02
Civ. 8487, 2003 WL 21900860 (S.D.N.Y. August 8, 2003)................................. 5

Nisselson v. Softbank AM Corporation f/k/a Softbank Finance Corporation et al. (In re
Marketxt Holdings Corp.), 361 B.R. 369 (Bankr. S.D.N.Y. 2007).......................... 2, 3, 4,
........................................................................................................... 11, 12, 13,
........................................................................................................... 14

Rombro v. DuFrayne (In re Med Diversified), 461 F.3d 251 (2d Cir. 2006) .................. 3, 15, 16,
........................................................................................................... 17

Stichting Ter Beharitiging Van de Belangen Oudaadehouders in Het Kapital Van Saybolt
International B.V. v. Schreiber, 327 F.3d 173 (2d Cir. 2003)............................... 2

In re Tricom, Case No. 08-10720........................................................... 20

Unsecured Claims Estate Representative v. Cigna Health Care, Inc. (In re Teligent, Inc.),
324 B.R. 479 (S.D.N.Y. 2005) ............................................................. 5

Waltzer v. Tradescape & Co., L.L.C., et al., 31 A.D. 3d 302, 819 N.Y.S.2d 38 ........... 8

## STATUTES

11 U.S.C. § 362 ............................................................................ 7

28 U.S.C. § 158(a)(1) ...................................................................... 5

11 U.S.C. § 510(b) .................................................................Passim

## MISCELLANEOUS

Slain and Kripke, The Interface Between Securities Regulation And Bankruptcy -
Allocating The Risk Of Illegal Securities Issuance Between Securityholders And
The Issuer's Creditors, 48 N.Y.U. L. Rev. 261 (1973)....................................... 16

## PRELIMINARY STATEMENT

This brief is submitted in support of the appeal of Kevin Waltzer and Stewart F.

Grossman, Trustee of the Newton Trust ("Appellants" or "Mr. Waltzer") from an order (the

"Order") of the United States Bankruptcy Court (Allan L. Gropper, U.S.B.J.) entered on June 4,

2008, granting appellees Alan Nisselson, as Chapter 11 trustee for the debtor MarketXT

Holdings Corp. ("Debtor") and the Official Committee of Unsecured Creditors of the Debtor

(collectively with Alan Nisselson, "Appellees") summary judgment. The Order was entered

following a "Not For Publication" decision of the Bankruptcy Court dated May 22, 2008 in

which the Bankruptcy Court concluded that Appellants' claim against the Debtor of $6,665,210

was subject to subordination under section 510(b) of the Bankruptcy Code, 11 U.S.C. § 510(b).[1]

Appellants' claim, for which the Debtor was found liable pre-petition by the New York

State Supreme Court, arose out of acts of fraud, breach of fiduciary duty and breach of contract

by the Debtor and two of its principal shareholders. The claim arose in December of 1998 when

Mr. Waltzer sold his interests in a predecessor of the Debtor. The finding of liability by the New

York Supreme Court and its Appellate Division, and the judgment awarded Mr. Waltzer, were

based on his having been cheated out of the fair purchase price for the interests he sold in the

Debtor's predecessor approximately five and one-half years before the commencement of the

Debtor's bankruptcy. Appellants' damage claim and the state court judgment were based upon

the difference between the amount received for the interests sold and what those interests were

worth on the day of the sale. Nevertheless, despite having a claim for five years, and having

long ceased being a shareholder, the Bankruptcy Court subordinated the claim because according

---

[1] The claim was originally filed by Mr. Waltzer and was subsequently transferred to Mr. Grossman in his capacity as trustee of the Newton Trust, of which Mr. Waltzer was the grantor.

to the lower court it fell within the "plain meaning" of section 510(b); i.e., it was a claim which had its origins in the sale of an equity security.[2]

Appellants strongly disagree with the decision of the Bankruptcy Court and urge this Court to reverse the lower court's ruling that Mr. Waltzer has a subordinated claim. The decision is wrong on numerous grounds. It is contrary to the principles of subordination under section 510(b) developed by the Courts of Appeals and deliberately ignores the limitations placed on section 510(b) by the Second Circuit. Indeed, in holding that the plain meaning of section 510(b) requires subordination, the Bankruptcy Court paid no mind to the Second Circuit's warning that when it comes to deciding whether a claim "arises from" a purchase or sale of a security, the statute has no plain meaning and its ambiguity requires an examination "outside the text of the statute to determine its intended meaning." Stichting Ter Beharitiging Van de Belangen Oudaadehouders in Het Kapital Van Saybolt International B.V. v. Schreiber, 327 F.3d 173, 181 (2d Cir. 2003). In point of fact, no court until now, not even the very Bankruptcy Court which ruled against Mr. Waltzer, has ever taken the position that section 510(b) applies to a creditor who ceased being an equity holder almost five years before a bankruptcy at a time when a debtor was solvent.

What is at once troubling, perplexing and inexplicable is that the decision of the Bankruptcy Court is at odds with its own earlier, far better reasoned and more comprehensive published decision rejecting these same Appellees' request that a claim of insiders of the Debtor be subordinated under section 510(b). On March 2, 2007, Judge Gropper issued his opinion in Nisselson v. Softbank AM Corporation f/k/a Softbank Finance Corporation et al. (In re Marketxt

---

[2] As a subordinated creditor, Mr. Waltzer will not receive any distribution on account of his claim, for which it took him seven years to reduce to judgment.

Holdings Corp.), 361 B.R. 369 (Bankr. S.D.N.Y. 2007) [hereinafter referred to as "Softbank" or the "Softbank Decision"]. While the Bankruptcy Court in Softbank expressly recognized the limitations placed on section 510(b) by the Second Circuit in Rombro v. DuFrayne (In re Med Diversified), 461 F.3d 251 (2d Cir. 2006) [hereafter Med Diversified], it found no such limitations here.

In Softbank the Bankruptcy Court refused to accept Appellees' argument that a claim held by an insider of the Debtor, Softbank Finance Japan ("Softbank Finance"), was subject to section 510(b) subordination. Softbank Finance's claim arose out of its acquisition of preferred stock of the Debtor in December of 2001. At all relevant times, Softbank Finance and its affiliates had invested millions of dollars in the Debtor and were represented on the Debtor's board of directors. In January and March of 2003, or slightly more than a year prior to an involuntary petition being filed against the Debtor, and under considerable financial pressures from Softbank Finance,[3] the Debtor agreed to convert or exchange the preferred shares for two promissory notes. According to the Softbank Decision, the claim actually filed by Softbank Finance was "based upon an action [that Softbank Finance had] commenced on August 25, 2003 in New York State Supreme Court." The Debtor failed to defend the action and a default judgment was entered against it. In deciding against these Appellees and in ruling that Softbank Finance's claim should not be subordinate, Judge Gropper held, among other things, that: (1) a court cannot "subordinate [a] claim based upon the fact that, at some point in the past, the debt had its genesis in a stock interest"; (2) the plain language of section 510(b) is limited and ambiguous; and (3) that while "Softbank may have taken an equity risk when it purchased

---

[3] See, e.g., Softbank, 361 B.R. at 381-383.

3

preferred stock, but by the date of the initial bankruptcy petition it was a creditor, not an equity holder." Softbank, 361 B.R. at 388, 389.

These conclusions were entirely proper and followed from the Second Circuit's decision in Med Diversified and the Third Circuit Court of Appeals' decision in Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133 (3d Cir. 2002) [hereafter In re Telegroup]. Both decisions found section 510(b) to be ambiguous, and both held that in applying the statute, courts had to consider the policies behind and the purposes of the statute. While the Bankruptcy Court did just that in the Softbank Decision, it refused to do so here.

The Bankruptcy Court never even tried to explain why it repudiated its prior analysis of section 510(b) and it provided no understandable explanation for why it concluded that Mr. Waltzer's claim, which was more remote in time and circumstances from the Debtor's bankruptcy than the claims of Softbank Finance, should receive harsher treatment than a claim of an insider. Subordination under section 510(b) cannot turn on the shape of a creditor's claim. Creditors who can pressure a debtor to convert their claim to a note should not receive a more favored treatment than creditors who lack the same leverage and have to sue a contumacious debtor to vindicate their rights. Indeed the distinction suggested by the decision below between a creditor who has a note and one who does not would make subordination dependent upon the vicissitudes of the debtor and its ability to treat its creditors differently. All that should matter is that Mr. Waltzer, like Softbank Finance, was a creditor on March 24, 2004 when the involuntary petition was filed. While Softbank had exchanged its shares for a note, upon which it sued pre-petition, and Mr. Waltzer had exchanged his shares and any benefit in the upside of the Debtor going forward for claims of breach of duty, breach of contract and fraud, this is a distinction without a principled difference.

4

## BASIS OF APPELLATE JURISDICTION

The United States District Court for the Southern District of New York (the "District Court") has jurisdiction to hear and determine this appeal pursuant to 28 U.S.C. § 158(a)(1) which provides in pertinent part that:

> The District Courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees … of bankruptcy judges entered in cases and proceedings referred to bankruptcy judges under section 157 of [Title 28] of the United States Code. An appeal under this subsection shall be taken only to the District Court for the judicial district in which the bankruptcy judge is serving.

All jurisdictional requirements of 28 U.S.C. § 158(a)(1) are met with respect to the Order. The Order was a final order entered in Adversary Proceeding No. 08-1102 and resolved all of the claims for relief set forth in the adversary complaint.

## STATEMENT OF ISSUE PRESENTED ON APPEAL

The Bankruptcy Court erred in granting Appellees' judgment motion to subordinate Mr. Waltzer's claim pursuant to section 510(b) of the Bankruptcy Code.

## STANDARD OF APPELLATE REVIEW

A grant of summary judgment by the Bankruptcy Court in an adversary proceeding is subject to de novo review by the District Court as to both the facts and the law because a determination by a lower court that there are no issues of fact is itself a legal conclusion. Unsecured Claims Estate Representative v. Cigna Health Care, Inc. (In re Teligent, Inc.), 324 B.R. 479, 486-87 (S.D.N.Y. 2005); see also FDIC v. Giammettei, 34 F.3d 51, 54-55 (2d Cir. 1994); Hanover Direct, Inc. v. T.R. Acquisition Corp. (In re T.R. Acquisition Corp.), No. 02 Civ. 8487, 2003, WL 21900860 at *4 (S.D.N.Y. August 8, 2003).

## STATEMENT OF FACTS

(a)     **The State Court Litigation**

In 1996, Mr. Waltzer acquired a 7-1/2% interest in a start up company known as C.S.

Block which was the Debtor's predecessor in interest. (Appendix, KW00172).[4] As it turned out,

Mr. Waltzer's initial investment in 1996 represented virtually all of the start-up capital for C.S.

Block. (Appendix, KW00601).

In December of 1998, Mr. Waltzer sold his interests in C.S. Block to its then controlling

shareholders, Omar and Sharif Amanat ("Amanat" and with the Debtor sometimes collectively

referred to as the "State Court Defendants") for $275,000. It turned out that unknown to Mr.

Waltzer, at the same time the State Court Defendants were about to conclude a transaction with a

venture capital firm, J.W. Childs and Associates ("J.W. Childs"), which would provide C.S.

Block with $26 million in new financing. The transaction valued the company at $62.2 million

pre- the J.W. Childs' investment and $80 million post-investment. (Appendix, KW00357;

KW00708-KW00709). After Mr. Waltzer learned of what had happened, he brought suit against

the State Court Defendants, asserting claims for breach of contract, breach of fiduciary duty and

fraud. (Appendix, KW00474-KW00526). Eventually, the New York Supreme Court entered a

judgment in his favor and awarded him $4,665,000 in damages plus pre-judgment interest.

Damages were based upon Mr. Waltzer's being cheated out of the legal purchase price for his

interests in C.S. Block when he sold them in December, 1998. (Appendix, KW00346-

KW00359).

In Mr. Waltzer's state court action, which began well prior to the commencement of

MarketXT's bankruptcy, the New York Supreme Court issued six separate orders directing the

---

[4] Simultaneously with the filing of this brief, Appellants are providing the Court and
Appellees with an appendix of the record on appeal.

State Court Defendants to produce documents pertaining to, among other things, the value of C.S. Block and the transaction with J.W. Childs. (Appendix, KW00414-KW00418). After the State Court Defendants willfully and contumaciously violated all six orders, the New York State Supreme Court struck their answer, affixed joint and several liability among them and ordered that the issue of damages be referred to a special referee for determination. This ruling as to liability was made on December 11, 2003 prior to the filing of the involuntary petition. (Appendix, KW00348).[5]

The initial inquest on damages was referred to Special Referee Lancelot B. Hewitt who completed the damages hearing on March 16, 2004. Before Special Referee Hewitt could issue his decision on damages, an involuntary bankruptcy petition was filed against the Debtor on March 26, 2004. When the New York State Supreme Court issued its decision on September 23, 2004 fixing damages against the Amanats, although the Debtor was jointly and severally liable with them, the automatic stay contained in 11 U.S.C. § 362 prevented the entry of judgment against the Debtor. Soon thereafter the Bankruptcy Court modified the stay by orders dated November 3, 2004 and March 18, 2005 allowing Mr. Waltzer to enter judgment against the Debtor. (Appendix, KW00814-KW00815).

The State Court Defendants appealed these judgments in December 2005. (Appendix, KW00414-KW00418). They achieved some limited success. By decision and order dated July 20, 2006 (Appendix, Id.), the Appellate Division, First Department, affirmed the lower court's liability findings, but directed a new, and limited, damages inquest. In rendering its decision, the Appellate Division ruled that the Supreme Court had properly struck the State Court Defendants

---

.[5] The State Court Defendants appealed this order and on July 26, 2006, the Appellate Division affirmed the determination of liability. (Appendix, KW00414-KW00418).

51041/0001-3110913v1

answer and that Special Referee Hewitt "correctly ruled that [the State Court Defendants] were precluded from offering any evidence of the inquest while permitting them to rebut plaintiff's proof with any evidence in the record."[6]

Although the First Department affirmed the Special Referee's ruling as to the manner in which the first inquest was conducted, it found that the lower court had committed a reversible error of procedure by not providing the State Court Defendants with a full opportunity to challenge Mr. Waltzer's proof through a cross-examination of Mr. Waltzer's witnesses. The First Department directed a new inquest at which time the State Court Defendants were to have the opportunity to challenge Mr. Waltzer's proof of damages through cross-examination of Mr. Waltzer's witnesses. The Appellate Division did not disagree with the Special Referee's conclusion that Mr. Waltzer's judgment was measured by the "out-of-pocket" rule, i.e. the difference between what Mr. Waltzer received for his interests in C.S. Block when he sold those interests in 1998 and their actual worth at the time of the sale.

A second inquest began on October 23, 2006 and was concluded on November 16, 2006. At the second inquest, Mr. Waltzer again asserted damages based upon the "out-of-pocket" rule. (Appendix, KW00661-KW00672). Mr. Waltzer's position was that he was creditor of the Debtor whose damages for the breach of contract, breach of fiduciary duty and fraud, all of which took place in 1998, was equal to the difference between what he received for his interests in C.S. Bock and what they were worth in December 1998. (Appendix, KW00661-KW00672).

At the second inquest, Mr. Waltzer again prevailed, and using the J.W. Childs valuation, the New York State Supreme Court concluded that in or about December of 1998, MarketXT

---

[6] The decision of the Appellate Division, First Department was reported at 31 A.D. 3d 302, 819 N.Y.S. 2d 38 and is reprinted at Appendix KW00414-KW00418.

had an equity value of at least $62.2 million. (Appendix, KW00346-KW00359). At the new

inquest, Mr. Waltzer also informed Special Referee Hewitt that the Appellees shared Mr.

Waltzer's view that in December 1998, C.S. Block was a very valuable enterprise, as they had

plead in <u>Softbank</u> that the Debtor was worth approximately $80 million at that time. (Appendix,

KW00671-KW00672).

On February 5, 2008, the New York Supreme Court issued an amended decision and

judgment reaffirming its earlier determination, and awarded damages in favor of Mr. Waltzer

against the State Court Defendants based upon an enterprise value of the Debtor's predecessor in

December 1998 of $62.2 million. In the amended decision, the New York Supreme directed

entry of a superceding judgment in favor of Mr. Waltzer against the Debtor in the amount of

$6,665,210. In the same decision, the New York Supreme Court found that:

> (i)      the State Court Defendants breached their fiduciary
> duty and defrauded Mr. Waltzer out of the value of his interest in
> C.S. Block;
>
> (ii)     the State Court Defendants agreed that at the time
> of the transaction in December 1998, C.S. Block was worth
> $62.6 million;
>
> (iii)    the true measure of damages was the actual
> pecuniary loss sustained as a direct result of the wrong, or what is
> known as the "out of pocket" rule. Under this rule, damages are to
> be calculated to compensate a plaintiff for what it lost, not what it
> might have gained. (Appendix, KW00357).

**(b)      Proceedings Below**

Mr. Waltzer filed his proof of claim on May 5, 2005. By adversary complaint dated

February 21, 2008, Appellees sought a judgment declaring Mr. Waltzer's claim to be subject to

subordination to general unsecured claims pursuant to section 510(b) of the Bankruptcy Code on

the ground that the claim arose "from rescission of a purchase or sale of a security of the Debtor,

and/or seeks damages arising from the purchase or sale of such a security within the meaning of

9

Bankruptcy Code § 510(b)." (Appendix, KW00553). Mr. Waltzer moved to dismiss the

Appellees' claim and the Appellees' cross moved for summary judgment. By opinion dated May

22, 2008, the Bankruptcy Court granted Appellees' motion for summary judgment.

### POINT I

### THE BANKRUPTCY COURT ERRED IN HOLDING THAT MR. WALTZER'S CLAIM IS SUBJECT TO SUBORDINATION UNDER SECTION 510(b)

On December 21, 1998, some five years and three months prior to the filing of an

involuntary petition against the Debtor, and approximately six years prior to the time that an

order for relief was entered adjudicating the Debtor a bankrupt, Mr. Waltzer sold his interests in

the Debtor's predecessor, C.S. Block. At that time, and years prior to these proceedings, he

ceased to have an equity interest in the Debtor or its predecessor and he was no longer entitled to

the benefits of ownership; but neither was he to be exposed to any of the concomitant risks

associated with equity. In its second decision and order of February 5, 2008, the Supreme Court,

New York County, reiterated its earlier determination and again made it clear that Mr. Waltzer's

claim was based upon what he should have received for his shares on December 21, 1998. The

decision did not undo the sale and it did not grant Mr. Waltzer's damages based upon principles

of lost profit or future expectations.

In its opinion, the Bankruptcy Court, claiming that the "scope of section 510(b) is broad,"

found that Mr. Waltzer's claim arose "in connection with his sale of an ownership interest in the

Debtor." This statement provided the predicate for the lower court's finding that Mr. Waltzer's

claim fell within the "plain meaning" of section 510(b). The Bankruptcy Court appeared to

adopt the test – never before used by a court in considering whether a claim fell under section

510(b) – that because Mr. Waltzer's claim could not have arise but for the sale of his interests in

C.S. Block, it had to be subordinated.[7]  The Bankruptcy Court went on to characterize Mr. Waltzer as an equity investor at the time of the involuntary petition, even though he long had ceased owning equity in the Debtor when the case began in March 2004.  The Bankruptcy Court made this statement in total disregard of the finding of the New York State Supreme Court which granted Mr. Waltzer damages based upon his selling of his interests and his having ceased being an equity security holder.  Thus, while the Bankruptcy Court gave lip service to the previous holding in its Softbank Decision, that "for such 510(b) purposes, Waltzer's rights should be determined as of the petition date," it did just the opposite.

The decision to subordinate Mr. Waltzer's claim was plainly wrong, both legally and factually, and in treating Mr. Waltzer so unfairly, the Bankruptcy Court intentionally ignored its own earlier decision and the limits on section 510(b) as set forth in In re Med Diversified.  In finding against Mr. Waltzer, the lower court also contradicted the Second Circuit decision that found section 510(b) to be ambiguous and failed to consider the purposes and policies of the statute as required by Med Diversified.

**(a)    The Softbank Decision**

In this very same chapter 11 case, these Appellees brought an adversary proceeding against Softbank Finance and a related entity.  In their adversary complaint, Appellees sought numerous types of relief including a request that one claim ("Claim No. 27") filed by Softbank Finance be subordinated pursuant to section 510(b) of the Bankruptcy Code.

According to the Softbank Decision, Claim No. 27, like Mr. Waltzer's claim, had its "genesis in a stock interest."  Softbank, 361 B.R. at 389.  In Softbank, the Bankruptcy Court

---

[7] Such a test would mean that every claim which had its "genesis" in an equity interest would be subject to subordination, a standard expressly rejected by at least one Court of Appeals. See, infra, at Point II.

found that between December 2001 and April 2002, the Debtor had issued three series of

preferred stock to Softbank Finance. <u>Softbank</u>, 361 B.R. at 388, n.11. In January and March of

2003, when the Debtor was under substantial economic pressure from Softbank Finance, it

exchanged these preferred shares for two promissory notes. <u>Id</u>. at 382. When the notes were not

paid, Softbank Finance commenced litigation in the New York State Supreme Court and after the

Debtor did not defend, it had a default judgment entered in December 2004.[8] In the same

opinion, the Bankruptcy Court found that the defendants were insiders of the Debtor and at all

relevant times, owned twenty-four percent (24%) of its voting stock. <u>Id</u>. at 386-87. The

Bankruptcy Court held, moreover, that because of its conduct, its large ownership interest in the

Debtor and representation on its board, Softbank Finance's conduct was subject to "more

rigorous scrutiny for equitable subordination purposes than a third party that was not a twenty-

four percent (24%) shareholder and a board member." <u>Id</u>. at 387.

 Appellees were the plaintiffs in <u>Softbank</u> and argued in that case that the plain meaning

of section 510(b) mandated that Softbank Finance's default judgment claim, which had its

"genesis" in preferred stock, was subject to mandatory subordination under section 510(b).

According to the <u>Softbank Decision</u>, the Appellees claimed that "strong policy consideration

support subordination in that "[t]he purpose of section 510(b) is to prevent shareholders, who

assume the risk of a business' failure by investing in securities rather than debt instruments from

filing claims as creditors when the debtor does fail." <u>Id</u>. at 388 quoting <u>Official Committee of</u>

---

[8] The <u>Softbank Decision</u> states that the judgment was entered in December 2004, after the
involuntary petition. Therefore even according to the Bankruptcy Court, Softbank Finance was
in the very same position as Mr. Waltzer at the time the involuntary petition was filed. Both had
findings of liability in their favor, although Softbank's was on default, but neither had yet
entered a judgment. This fact alone makes the lower court's decision in this case all the more
astonishing.

Unsecured Creditors v. Am Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.), 306 B.R. 778,

782 (Bankr. D. Del. 2004).  In Softbank, the Bankruptcy Court rejected this argument, because

"plaintiffs cite no authority for the proposition that a court may use section 510(b) to disregard a

note held by a creditor and subordinate a claim based on the fact that at some time in the past, the

debt had its genesis in a stock interest."

In holding that the judgment claim of insider Softbank Finance was not subject to

subordination, the Bankruptcy Court noted that while section 510(b) is to be read broadly, its

breath is limited by the policies and purposes behind the statute.  Citing to Med Diversified, in

which the Second Circuit found section 510(b) to be "ambiguous," the Bankruptcy Court stated:

> It [the Second Circuit] held that the critical issues in determining
> whether subordination is required under section 510(b) are (i)
> whether the party to be subordinated 'took on the risk and return
> expectations of a shareholder rather than a creditor;' and (ii)
> whether that party 'seeks to recover a contribution to the equity
> pool presumably relied upon by creditors in deciding whether to
> extend credit to the Debtor.' Id. at 389.

The Bankruptcy Court acknowledged that Softbank Finance may have taken on an equity

risk when it purchased its equity interest but by the date of the initial bankruptcy petition it was a

creditor, not an equity holder.  According to the Softbank Decision "[i]t is black letter law that

claims are analyzed as of the date of the filing of a petition, not as of a hypothetical date in the

past."  The Bankruptcy Court also found that "there [was] no indication that any creditor could

have extended credit to the Debtor in reliance on Softbank's holdings." Id. at 389.

Based upon the principles set out by the Second Circuit in Med Diversified, the Softbank

Decision held that subordination of Softbank Finance's claim went well beyond the outer limits

of section 510(b).  The Court concluded:  "There is an insufficient causal relationship alleged

between Softbank's prior purchase of preferred stock and the claim it held on the date of the

petition and subordination of Softbank's debt claim based solely on the terms of § 510(b) would not further the policies underlying the statute." Id. at 390.

Little more than a year later, Mr. Waltzer's claim was brought before the same Bankruptcy Court. However, unlike Softbank Finance, Mr. Waltzer was not an insider of the Debtor, having relinquished his interests in 1998; nor did the Appellees allege, as they did in Softbank, that Mr. Waltzer was a controlling shareholder owing a fiduciary duty to the Debtor and its creditors; and unlike Softbank Finance, Waltzer did not own 24% of the Debtor nor did he have representation on the Debtor's board of directors.

Other facts illustrate why Mr. Waltzer's claim is a less likely candidate for subordination than was the claim of Softbank Finance. For example, Softbank Finance exchanged an equity interest for a promissory note approximately one year before the bankruptcy petition was filed at a time when the Debtor was in financial duress and under circumstances which suggested that Softbank Finance used its leverage to force the exchange. Mr. Waltzer, on the other hand, ceased being a shareholder years prior to the bankruptcy. The record reflects that when he gave up his interests, the Debtor was in robust financial health and had an enterprise value, as found by the New York State Supreme Court, of anywhere between $62.5 million and $80 million. Lacking Softbank Finance's economic leverage, insider privileges and its ability to protect its interests, Mr. Waltzer ended up being cheated out of the fair value of his interest as valued on the date the transaction took place. It is indeed strange and disheartening that a creditor such as Mr. Waltzer, who was defrauded out of the fair value of his property, should receive harsher treatment by the court than Softbank, a creditor who could use its knowledge and control of the

Debtor to have equity converted to debt. Such a result is simply not ordained by the facts, existing law or a fair and reasonable interpretation of section 510(b).[9]

## POINT II

### THE SECOND CIRCUIT DECISION IN MED DIVERSIFIED REQUIRES THE REVERSAL OF THE BANKRUPTCY COURT'S SUMMARY JUDGMENT

In August of 2006, the Second Circuit issued its opinion in Med Diversified. The specific issue before the Court of Appeals in the case was "whether the statute [section 510(b)] requires subordination of the claim of a former executive employee of the debtor, when the claim is based on the debtor's failure to issue its common stock to the executive in exchange for his stock in another company as provided by a termination agreement." Med Diversified, 461 F.3d at 253. The undisputed facts in Med Diversified were that appellant, Mr. David Rombro, had entered into an executive employment agreement with the debtor which was terminated in 2001. Under the termination agreement, the debtor had agreed to issue Mr. Rombro 905,500 shares of its common stock in exchange for 905,500 shares of stock in another company, PrimeRX. When the stock exchange failed to occur, Mr. Rombro brought suit for breach of contract and fraudulent inducement.

---

[9] The Softbank Decision does not give the full flavor of the allegations made against Softbank Finance by the Appellees. Besides characterizing Softbank Finance as an insider and control person of the Debtor, the Appellees accused Softbank Finance of abusing its fiduciary position, at a time when the Debtor was insolvent or in the zone of insolvency, "to prefer itself and gain advantages over the Debtor's creditors and shareholders," and "blatantly" abusing its position to engage in self-dealing. As to the Debtor's condition at the time Softbank Finance converted its equity to notes, the Appellees had this to say: "Then, in January 2003, at a time when the Debtor was in dire financial straits, with no officers, with creditors demanding payment and obtaining default judgments, Softbank forced the Debtor to sign ..." an "onerous" agreement. (Appendix, KW00693, ¶ 19; KW00694-KW00695, ¶20).

The threshold issue in <u>Med Diversified</u>, was whether under the "plan meaning" of section 510(b), a claim based upon the failure to receive stock could "arise from" the purchase or sale of stock. The District Court affirmed the Bankruptcy Court ruling that Mr. Rombro's claim did in fact fall within the reach of section 510(b) because "despite the fact that [Mr. Rombro] never actually received any shares in Debtor [Rombro] bargained for a position as shareholder and all its attendant benefits and risks including Debtor's inability to fulfill its contractual obligations with creditors and its shareholders. [Rombro] cannot expect to both reap a shareholder's benefits when the Debtor was profitable and then avoid a shareholder's risks by gaining creditor status when Debtor went bankruptcy." <u>Med Diversified</u>, 461 F.3d at 254.

Rombro had argued that the plain meaning of the words "arising from" in section 510(b), could not support summary judgment against him as to a claim for damages due to the failure to issue shares in the debtor. The dispute over whether such a claim actually fell under section 510(b) lead the Second Circuit to find that the phrase "arising from" to be "reasonably susceptible to both Rombro's narrow construction and the trustee's broader reading, and therefore we conclude that the phrase is ambiguous." <u>Med Diversified</u>, 461 F.3d at 255. Once it reached this conclusion, the Court of Appeals resorted to the statute's legislative history for interpretative guidance.

Citing to the seminal article of Professors Slain and Kripke, <u>The Interface Between Securities Regulation And Bankruptcy – Allocating The Risk Of Illegal Securities Issuance Between Securityholders And The Issuer's Creditors</u>, 48 N.Y.U. L. Rev. 261 (1973) [hereafter "Slain and Kripke"], the Second Circuit identified two policy reasons for subordinating claims under section 510(b):

> [W]e conform our interpretation of the statute to require
> subordination here only if Rombro "took on the risk and return

> expectations of a shareholder, rather than a creditor, or (2) [sought]
> to recover a contribution to the equity pool presumably relied upon
> by creditors in deciding whether to extend credit to the debtor."

Med Diversified, 461 F. 3d at 256.

Because Mr. Rombro "took on the risk and return expectations of a shareholder" when he accepted shares of the debtor his claim arose from a purchase of stock. Med Diversified, 461 F. 3d at 256. The Court of Appeals went on to find that Mr. Rombro had not bargained "for cash but to become a stockholder in the debtor. Once he entered a binding agreement obligating him to purchase shares of the debtor in return for his shares of PrimeRx and to forego the significant cash compensation to which he otherwise was due upon termination, he became bound by the choice he made to trade the relative safety of cash compensation for the potential upside of a shareholder status – the very choice highlighted by Slain and Kripke." Id. In finding against Mr. Rombro, the Second Circuit recognized that while it was interpreting section 510(b) broadly, there were "outer boundaries" of the statute's text and purpose and in that regard it relied heavily on the decision of the Third Circuit decision in In re Telegroup, Inc.

In this case, the facts show that Mr. Waltzer was in the reverse position to Mr. Rombro. Where Mr. Rombro had bargained away cash compensation for the "upside potential of shareholder status," Mr. Waltzer bargained away the upside potential for cash. Whereas, Mr. Rombro's claim carried with it the implicit acknowledgement that he wanted shares in the debtor, Mr. Waltzer's claim is for the fair value of what he sold years earlier. Thus, the important policy behind section 510(b) of treating claims of those who at the time of a bankruptcy petition have the "risk and return expectations of a shareholder" does not apply here.

Similarly, the second purpose behind section 510(b), to insure that creditors who presumably relied upon the equity investment of a shareholder in advancing credit not have their claims diluted by the claims of equity, is not present. There is simply no way that any entity who

was an unsecured creditor as of the petition date was aware of Mr. Waltzer's investment in 1996, or that as of the petition date any creditor had a claim which arose prior to December, 1998 when he sold his interests. Indeed, the Bankruptcy Court had concluded that no creditor relied upon the very material and much larger equity investment made by Softbank Finance from 1999 to 2002, so it could not have found, and in fact did not so find, that creditors relied upon Mr. Waltzer's equity interests to advance credit to the Debtor, nor have Appellees so alleged.

In reaching its conclusion that there are limits to subordination under section 510(b), the Second Circuit cited numerous times to the Third Circuit decision in In re Telegroup. In re Telegroup may be the leading case on the scope of section 510(b), and it too requires a reversal. The appellants in In re Telegroup were shareholders of the debtor who had filed proofs of claims seeking damages for the debtor's alleged breach of its agreement to use its best efforts to see that their stock was registered and freely tradable. In re Telegroup, 281 F.3d at 135. The appellants argued that their claims did not fall under the plain meaning of the statute as ones "arising from" the purchase or sale of a security.

The Third Circuit, like the Second Circuit, found the phrase "arising from the purchase or sale of ... a security" to be ambiguous, and it stated, that for a claim to arise under section 510(b) there must be a nexus of causal relationship between the claim and the statute. It held, however, that the nexus of relationship was unclear from the text of the statute, so it turned to the legislative history of section 510(b), and in particular the Slain and Kripke article, to give context to the phrase "arising from". According to the In re Telegroup opinion, Slain and Kripke took the position that claims of shareholders arising from the issuance of stock should be subordinated. Id. at 139. ["Slain and Kripe therefore concluded that shareholder claims alleging illegality in the issuance of stock should be subordinated to the claims of general unsecured

creditors." Id. at 140 [emphasis supplied][10]. According to the Third Circuit, section 510(b) represented the legislative judgment that as between shareholders and general unsecured creditors, shareholders should "bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy." Id. at 141. The Court went on to find that the appellants in In re Telegroup were clearly equity investors and shareholders at the time of the filing and that their claims were really a request for compensation for a decline in the value of the debtor's stock. The court held:

> Because claimants retained the right to participate in corporate profits, if Telegroup succeeded, we believe that § 510(b) prevents them from using a breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors. Were we to rule in claimants' favor in this case, we would allow stockholders in claimants' position to retain their stock and share in the corporations' profits if the corporation succeeds, and to recover a portion of their investment in parity with creditors of the corporation if the corporation fails. (emphasis supplied).

Id. at 142.

As did the Second Circuit in Med Diversified, the Third Circuit rejected the kind of extraordinarily broad reading given to section 510(b) by the Bankruptcy Court in this case – but not in Softbank. Unlike the Bankruptcy Court, the Courts of Appeals have ruled that claims which arise from the sale of a security are not ipso facto, subordinated. "If Congress had wanted to subordinate all claims of security holders to an equity position, regardless of the source of the claim, Congress would have worded section 510(b) to say: 'All claims made by security holders regardless of the source of the claim, shall be subordinate to an equity class …However,

---

[10] See also In re Telegroup, 281 F. 3d at 139 ["Slain and Kripke argued that the 'situation we are concerned with involves two risks: (1) the risk of business insolvency from whatever cause; and (2) the risk of illegality in securities issuance.'"] Mr. Waltzer's claim did not arise out of issuance of stock and we have not located a case where a creditor who sold his shares pre-petition has had a claim for the unpaid sale price being subordinated.

Bankruptcy Code section 510(b) does not say this. Thus, section 510(b)'s subordination of claims' arising from the sale or purchase of a security must mean subordinating _less_ than _every_ claim of a security holder, regardless of how that claim arises.'" In re Telegroup, 281 F. 3d at 144 [emphasis in original].[11]

## CONCLUSION

For the reasons set forth above, Appellants urge this Court to reverse the Bankruptcy Court's summary judgment order, find that the Appellants' claim is not subject to subordination under section 510(b), and order that the adversary complaint be dismissed.

DATED:    New York, New York
            July 31, 2008

                        Respectfully submitted,

                        COLE, SCHOTZ, MEISEL,
                        FORMAN & LEONARD, P.A.
                        A Professional Corporation

                        By: _____
                              Laurence May, Esq. (LM-9714)
                        900 Third Avenue
                        New York, NY 10022
                        Tel.: (212) 752-8000
                        Fax: (212) 752-8393

                              -and-

---

[11] Apparently even counsel for one of the Appellees' agrees with Appellants that the limitless reading given to section 510(b) by the lower court is contrary to Second Circuit precedent. In communications to Bankruptcy Judge Stuart M. Bernstein in In re Tricom, Case No. 08-10720, counsel for the Creditors' Committee wrote: "But while interpreting Section 510(b) broadly, [in Med Diversified] the Second Circuit also recognized that there are limits to its scope and held that it may not be applied to subordinate a claim when doing so would not further the policies underlying section 510(b)." This letter, dated June 5, 2008, is a publicly filed document and a copy can be provided to the Court if requested.

ERIC R. LEVINE, ESQ. (EL-7677)
EISEMAN LEVINE LEHRHAUPT &
KAKOYIANNIS, P.C.
805 Third Avenue
New York, NY 10022
Tel.:  (212) 752-1000
Fax:  (212) 355-4608

Co-Counsel for Creditors Kevin Waltzer and
Stewart F. Grossman, Trustee of the Newton Trust